UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,           )
                              )
         v.                   )   CRIMINAL ACTION
                              )   NO. 05-10062-WGY
JAMES STEWART,                )
A/K/A JAMES STEWART, JR.,     )
A/K/A JAMES L. STEWART,       )
                              )
         Defendant.           )
                              )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    January 8, 2007


On a historical island between the looming skyscrapers and glass office buildings of the Boston financial district sits the Old State House - a small but ornate brick building that was once the seat of the royal government in colonial Massachusetts. This building is perhaps best remembered for the white, second floor balcony where, on July 18, 1776, Colonel Thomas Crafts read to the people of Boston a copy of the newly signed Declaration of Independence. Yet, fifteen years earlier an event occurred in that building that a young John Adams witnessed and would describe as "the first scene of the first act of opposition to the arbitrary claims of Great Britain. . . . Then and there the

child independence was born."  David McCullough, John Adams 62
(Simon & Schuster 2001).

John Adams was referring to the eloquent five-hour speech
James Otis gave against the Writs of Assistance – the general
warrants authorized by the British Crown to customs officials
allowing them to conduct arbitrary searches for untaxed imported
goods.  Otis had argued that any statutory authority that
purported to grant such a general writ violated common-law
principles and was, as a result, null and void.  The arguments
made by Otis highlighted the colonists' aversion to arbitrary
governmental action and were instrumental in the enactment of the
Fourth Amendment to the United States Constitution.

Today, this Court is called upon to apply the principles
that once resonated in the halls of the Old State House and in
the minds of the Framers of our Constitution to a situation
framed by technology, penological interests, and suspect
statutory authority.  James Stewart ("Stewart") brings this
Motion to Modify Conditions of Probation [Doc. No. 16] seeking to
preclude the United States Probation Department from obtaining a
DNA[1] sample pursuant to the DNA Analysis Backlog Elimination Act
of 2000 ("DNA Act"), codified at 42 U.S.C. §§ 14135-14135e and 10

---

[1] DNA is the common abbreviation for deoxyribonucleic acid,
which contains the genetic information of human beings.  With the
exception of identical twins, DNA is unique to each individual.
United States v. Sczubelek, 402 F.3d 175, 181 n.2 (3d Cir. 2005).

U.S.C. § 1565, and in accordance with the special conditions of his probation.  Stewart argues that the DNA Act, by compelling a collection of his DNA while on probation, violates his constitutional rights under the Fourth Amendment to the United States Constitution.  This Court agrees and holds the DNA Act unconstitutional as applied to Stewart.

I.   **UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND**

On March 16, 2005, the United States indicted Stewart for one (1) Count of Theft of Public Money, Property or Records under 18 U.S.C. § 641 [Doc. No. 1].  Specifically, Stewart was charged with the unlawful diversion of approximately $30,796 in Social Security disability benefits.  Stewart initially pled not guilty to the charge but later changed his plea to guilty after negotiating a plea agreement [Doc. No. 10] ("Plea Agreement").

On January 5, 2006, this Court sentenced Stewart to three years on probation [Doc. No. 15] ("Order").  As a special condition of probation, the Court included a requirement to submit to the collection of a DNA sample.  Order at 2.  The original plea agreement did not contain this requirement.  See Plea Agreement at 1-7.  The DNA Act provides the statutory authority to order the collection of a DNA sample.

Congress passed the DNA Act in 2000 to provide for the collection and analysis of DNA samples taken from a class of

3

offenders.  42 U.S.C. § 14135.  The DNA Act requires a probation
officer to collect a DNA sample from any person placed on
supervised release, parole, or probation who is or was convicted
of a qualifying federal offense.  Id. § 14135a(a)(2).  A
qualifying offense includes any felony and any statutory crime
under chapter 109A of Title 18 (crime of sexual abuse) or section
16 of Title 18 (general crime of violence), as well as any
attempt or conspiracy to commit any of those offenses.  Id. §
14135a(d)(1)-(4).  A probation officer is authorized, pursuant to
a 2006 amendment, to use any "means as are reasonably necessary
to detain, restrain, and collect a DNA sample from an individual
who refuses to cooperate in the collection of the sample."  Id. §
14135a(a)(4)(A).  The collected sample is furnished to the
Federal Bureau of Investigation for analysis and then entered
into the Combined DNA Index System ("CODIS").[2]  Id. § 14135a(b).
CODIS is a national DNA database created formally in 1994 with
the passage of the Violent Crime Control and Law Enforcement Act.
42 U.S.C. § 14132.  CODIS allows "[s]tate and local forensics
laboratories to exchange and compare DNA profiles electronically
in an attempt to link evidence from crime scenes for which there

---

[2] As of October, 2006, CODIS contained 3,874,394 DNA
profiles, with 3,720,564 of them convicted offender profiles.
Fed. Bureau of Investigation, NDIS Statistics, *available at*
http://www.fbi.gov/hq/lab/codis/clickmap.htm (last visited
January 4, 2006).

are no suspects to DNA samples of convicted offenders on file in the system."  H.R. Rep. No. 106-900(I), at 8 (2000).

Stewart refuses to follow the dictates of the DNA Act and the special condition of his probation that require a collection of his DNA sample.  On June 9, 2006, Stewart filed the motion to modify conditions of his probation at issue before this Court. Were his motion denied, his refusal to submit a blood sample to the United States Probation Department would violate the special conditions of his probation and constitute a Class A misdemeanor offense under 42 U.S.C. § 14135a(5)(A).  The United States Government opposes the motion and filed a supporting memorandum [Doc. No. 17].

## II.   DISCUSSION

### A.   Applicability of the Fourth Amendment

The Fourth Amendment extends constitutional protection to the individual "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and concomitantly provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. const. amend. IV.

Before Fourth Amendment protections attach, the governmental "search" or "seizure" must implicate a constitutionally protected

interest.  See United States v. Dionisio, 410 U.S. 1, 15 (1973).

The modern test for a constitutionally protected interest derives

from Justice Harlan's concurrence in Katz v. United States, which

stated that a governmental search or seizure must violate a

subjective expectation of privacy that society objectively

recognizes as reasonable.  389 U.S. 347, 361 (1967) (Harlan, J.,

concurring); see also Oliver v. United States, 466 U.S. 170, 177

(1984).  This two-prong requirement presents a threshold that

must be satisfied before a Fourth Amendment inquiry into the

constitutionality of a search or seizure is required.  See Katz,

389 U.S. at 361.[3]

     Applying this threshold inquiry to Stewart, the first issue

is whether Stewart has an expectation of privacy in the

collection of his DNA.  See Katz, 389 U.S. at 361.  When the

government extracts blood for the purpose of collecting DNA, two

searches occur, each implicating a potential expectation of

privacy.  See Skinner v. Railway Labor Executives' Ass'n, 489

U.S. 602, 616 (1989).  The first expectation of privacy concerns

---

     [3] For example, one does not have a reasonable expectation of
privacy in attributes placed on public display.  Katz, 389 U.S.
at 351 ("What a person knowingly exposes to the public, even in
his own home or office, is not a subject of Fourth Amendment
protection.").  Such publicly displayed attributes include one's
voice, Dionisio, 410 U.S. at 14, handwriting, United States v.
Mara, 410 U.S. 19, 21 (1973), financial records filed with a
bank, United States v. Miller, 425 U.S. 435, 436-37 (1976), and
trash left on a curb, California v. Greenwood, 486 U.S. 35, 37
(1988).

the physical penetration of the person to extract the blood.  The second expectation is implicated when the blood is tested and the information contained in DNA is revealed.  The Supreme Court, in Skinner, recognized that the taking and testing of a blood sample constitutes two separate searches when it stated, "[t]he ensuing chemical analysis of the [blood] sample to obtain physiological data is a further invasion of the tested employee's privacy interests."  Id.

There is little doubt that both searches invade an expectation of privacy and implicate the Fourth Amendment.  The taking of a blood sample constitutes a "'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny."  See Cupp v. Murphy, 412 U.S. 291, 295 (1973) (citing Terry v. Ohio, 392 U.S. 1, 24-25 (1968)).  The Supreme Court, in Schmerber v. California, addressed this issue directly and found that the compelled administration of a blood test falls within the reach and protections of the Fourth Amendment.  384 U.S. 757, 767 (1966).  Any forced extraction of blood, therefore, invades one's expectation of privacy in bodily integrity, and its reasonableness must be adjudged under a Fourth Amendment analysis.

In addition, when blood is extracted and analyzed to reveal information derived from one's DNA, a second intrusion into one's expectation of privacy occurs.  See Skinner, 489 U.S. at 616;

7

Ferguson v. City of Charleston, 532 U.S. 67, 76 (2001) (holding that a test of a urine sample implicates the Fourth Amendment). In Skinner, the Supreme Court held that the chemical analysis of urine implicated the Fourth Amendment because such a test could "reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic." 489 U.S. at 617.  Here, DNA is a source of physiological data that far exceeds urine.  See, e.g., United States v. Kincade, 379 F.3d 813, 849-50 (9th Cir. 2004) (en banc) (Reinhardt, J., dissenting) (noting that current biological developments are undermining the theory of "junk DNA").  This data includes information on one's race or sex, genetic defects, predispositions to diseases, and possibly even sexual orientation.  Id. at 850; see also Tania Simoncelli & Barry Steinhardt, California's Proposition 69: A Dangerous Precedent for Criminal DNA Databases, 33 J.L. Med. & Ethics 279, 288 (2005).  This information is of the most sensitive and personal nature, and it is inconceivable that one would expect this information to be readily available to the government or to the public.

That the Fourth Amendment applies to the search and extraction of DNA from Stewart is not truly in dispute.  The existence of a constitutionally protected expectation of privacy is required before a Fourth Amendment violation can be

considered.  Every circuit court cited by the government reaches a Fourth Amendment inquiry when addressing the collection and analysis of one's DNA.  See Nicholas v. Goord, 430 F.3d 652, 658 (2d Cir. 2005); United States v. Sczubelek, 402 F.3d 175, 182 (3rd Cir. 2005); Jones v. Murray, 962 F.2d 302, 306 (4th Cir. 1992); Groceman v. United States Dep't of Justice, 354 F.3d 411, 413 (5th Cir. 2004) (per curiam); Green v. Berge, 354 F.3d 675, 676-77 (7th Cir. 2004); Kincade, 379 F.3d at 821; United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir. 2003); Padgett v. Donald, 401 F.3d 1273, 1277 (11th Cir. 2005); and Johnson v. Quander, 440 F.3d 489, 493 (D.C. Cir. 2006).  Though courts often speak of a diminished expectation of privacy in such information for one convicted of a crime, the weight of that status as a factor occurs in the context of a Fourth Amendment balancing test, specifically on the degree of intrusion suffered.  See, e.g., Johnson, 440 F.3d at 495.  The status of a convicted criminal does not affect the threshold question whether the Fourth Amendment initially attaches.

**B.   The General Fourth Amendment Test**

Stewart's constitutionally recognized expectations of privacy are implicated by the collection of his DNA and, therefore, must satisfy a Fourth Amendment inquiry.  The text of the Fourth Amendment includes two clauses contained in the same sentence.  U.S. const. amend. IV.  The first clause

9

("reasonableness clause") prohibits "unreasonable" searches and seizures.   The second clause ("warrant clause") details the suspicion and particularity requirements necessary for a warrant to issue.   <u>Id.</u>   For most of the Fourth Amendment's history, the Supreme Court read the two phrases together, interpreting the vague term "unreasonable" as modified by the requirements of the "warrant clause."[4]   <u>United States</u> v. <u>U.S. District Court for E.</u> <u>Dist. of Mich., S. Div.</u>, 407 U.S. 297, 315 (1972) ("[T]he definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause.")   Under this interpretation, a search would be reasonable only if supported by probable cause *and* executed pursuant to a warrant specifically describing its scope.   <u>See</u> <u>id.</u>   This is known as the "unitary" approach to Fourth Amendment analysis because it requires the presence of *both* predicates.

Though this concatenated reading of the Fourth Amendment often remains as a refrain to the "ordinary" or "general"

_____

[4] Professor Thomas Davies from the University of Tennessee presents an exhaustive historical and textual analysis of the Fourth Amendment in his law review article <u>Recovering the</u> <u>Original Fourth Amendment</u>, 98 Mich. L. Rev. 547 (1999).   Davies argues convincingly that the Fourth Amendment was targeted solely at curbing legislative power to grant general warrants and that the Framers understood that individual discretion by officials would be aptly curbed by existing common law.   <u>Id.</u> at 724.   In addition, the insertion of the conjunction "and" in the text of the Fourth Amendment occurred during the House debate to make James Madison's draft more imperative, not to provide a separate inquiry.   <u>See</u> <u>id.</u> at 716-720.

inquiry, see Kincade, 379 F.3d at 822, the Supreme Court, in recent years, has abandoned this approach and bifurcated the Fourth Amendment, focusing on the reasonableness clause exclusively, relatively unaffected by the requirements of the warrant clause, see, e.g., Samson v. California, -- U.S. --, 126 S. Ct. 2193, 2197 (2006); United States v. Knights, 534 U.S. 112, 118 (2001).  The modern analysis starts with the premise that "[t]he touchstone of the Fourth Amendment is reasonableness." Knights, 534 U.S. at 118.

Reasonableness, under this framework, is determined by examining the totality of the circumstances.  Samson, 126 S. Ct. at 2197.  This requires a balancing "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  Knights, 534 U.S. at 119 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)).

C.   **Exceptions to the General Fourth Amendment Standard**

The general balancing test for reasonableness grows out of an exception to the accepted Fourth Amendment standard for administrative searches.  The Supreme Court recognized this exception for situations where a governmental search was incompatible with traditional probable cause concepts requiring individualized suspicion.  See Camara v. Municipal Court of San Francisco, 387 U.S. 523, 536-38 (1967).  For example, the Supreme

Court, in _Camara_ v. _Municipal Court of San Francisco_, held that
area inspections seeking to enforce promulgated housing codes are
reasonable when conducted with a warrant despite lacking
traditional individualized suspicion.  _Id._ at 538-39.  The
Supreme Court recognized that individualized suspicion would be
impracticable and stated that "there can be no ready test for
determining reasonableness other than by balancing the need to
search against the invasion which the search entails."  _Id._ at
536-37.  On one side of the balance the Court weighed the
governmental interest in conducting the housing code inspections.
_See id._ at 535.  On the other side, the Court looked to the
intrusion that resulted from such a search.  _See id._ at 538-39.
The Supreme Court weighed this balance in favor of the
administrative search while stressing the importance of the
administrative regulations that limited the discretion of the
governmental official.  _See id._ at 538.  In such cases, the
administrative regulations stand in the place of probable cause.
_See id._

Initially, as in _Camara_, warrants were required for these
administrative searches unless some exigency was present.  _See,
e.g._, _id._ at 539-40.  Over time, however, the Court began
dispensing with the warrant requirement in situations where
obtaining a warrant could inhibit the inspections, again relying
on the existence of sufficiently defined regulations to provide

12

an adequate substitute for the particularity requirements of a
warrant. See, e.g., Donovan v. Dewey, 452 U.S. 594, 602-03
(1981) (upholding warrantless inspections required by the Mine
Safety and Health Act); United States v. Biswell, 406 U.S. 311,
317 (1972) (upholding warrantless inspections required by the Gun
Control Act of 1968).

     In addition to the need for discretion-limiting
regulations, the Supreme Court has also required that the primary
purpose of such searches to be something other than general crime
control. See City of Indianapolis v. Edmond, 531 U.S. 32, 47-48
(2000) (holding a police checkpoint to interdict narcotic traffic
invalid because the principal purpose of the checkpoint was to
detect evidence of criminal wrongdoing).  Despite these
limitations, the Supreme Court has expanded the administrative
search rationale to include border searches, United States v.
Martinez-Fuerte, 428 U.S. 543 (1976), drunk driving checkpoints,
Michigan Dep't of State Police v. Sitz, 496 U.S. 444 (1990), and,
by implication, airport searches, see Chandler v. Miller, 520
U.S. 305, 323 (1997).

     A subcategory has evolved from the administrative search
rationale that is often denominated the "special needs"
exception.  Justice Blackmun in a concurring opinion in a high
school search case first used the term "special needs" when he
spoke of an exception applying where "special needs, beyond the

normal need for law enforcement, make the warrant and
probable-cause requirement [sic] impracticable."  New Jersey v.
T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); see
Edmond, 531 U.S. at 54 (Rehnquist, C.J. dissenting) ("The
'special need' doctrine . . . is an exception to the general rule
that a search must be based on individualized suspicion of
wrongdoing.").

The "special needs" exception is often invoked as a
corollary to the administrative search exception either to
validate a general suspicionless and warrantless search or in
specific situations where a search is required but obtaining a
warrant would be impracticable.  See Vernonia Sch. Dist. v.
Acton, 515 U.S. 646, 663-65 (1995) (upholding suspicionless and
warrantless drug testing because it provides an administrative
process with a minimal amount of discretion); Schmerber, 384 U.S.
at 770-71 (holding a warrantless blood test reasonable due to
blood's rapid loss of its alcohol content).  For example, the
Supreme Court, in New Jersey v. T.L.O., stated, "The warrant
requirement, in particular, is unsuited to the school
environment: requiring a teacher to obtain a warrant . . . would
unduly interfere with the maintenance of the swift and informal
disciplinary procedures needed in the schools."  469 U.S. at 340.
These special needs categories have occasioned warrantless Fourth
Amendment searches based upon either no individualized suspicion

or suspicion less than the traditional probable cause standard in situations such as public school searches, id. at 340, public employee searches, O'Connor v. Ortega, 480 U.S. 709, 721-25 (1987) (plurality opinion), and, as discussed further below, searches of people on probation, Griffin v. Wisconsin, 483 U.S. 868, 876 (1987).

The "special needs" exception -- just as in the case with the broader category of administrative searches -- must serve a primary purpose separate from the general interest in crime control. See Ferguson v. City of Charleston, 532 U.S. 67, 79-80 (2001) (holding a policy that required urine testing of maternity patients invalid because its primary purpose was the use of law enforcement to coerce the patients into substance abuse treatment). In addition to this requirement, the "special needs" exception requires a governmental purpose narrowly tailored to the means used to effectuate that purpose. Skinner, 489 U.S. at 629-30; National Treasury Employees Union v. Von Raab, 489 U.S. 656, 680-81 (Scalia, J., dissenting).

For example, in Skinner v. Railway Labor Executives, the Supreme Court upheld drug tests immediately following an accident due to the demonstrated nexus between the safety of railroad operations and drugs and alcohol. See Skinner, 489 U.S. at 629-30. Justice Scalia, in his dissent in National Treasury Employees Union v. Von Raab, highlighted the nexus requirement by

15

distinguishing <u>Skinner</u>.  <u>National Treasury Employees Union</u>, 489
U.S. at 680-82 (Scalia, J., dissenting).  In <u>National Treasury
Employees Union</u>, the contested search involved urine testing of
Customs Service employees to protect the integrity of the agency
by discharging employees who, through their own drug use, would
allegedly be unable fully to perform their duty to interdict
narcotics.  <u>Id.</u> at 682.  Justice Scalia argued that the
governmental purpose provided was too generalized and speculative
to find the drug testing reasonable.  <u>See</u> <u>id.</u> at 684.  Thus, when
operating outside the warrant requirement, a "special needs"
search must be narrowly tailored to achieve a legitimate purpose.
<u>See</u> <u>Delaware</u> v. <u>Prouse</u>, 440 U.S. 648, 659 (1979) (holding that
random spot checks were not narrowly tailored to the purpose of
ensuring an adequate amount of insurance coverage).

     D.    **Focusing the Appropriate Fourth Amendment Test**

The courts that have addressed suspicionless and warrantless
searches of DNA from persons convicted of crimes follow
inconsistent paths with respect to the test used to evaluate the
constitutionality of the searches.  Some of the circuit courts
have applied a general balancing test, <u>see, e.g.</u>, <u>Johnson</u>, 440
F.3d at 496, while others have analyzed such searches under the
"special needs" exception, <u>see, e.g.</u>, <u>Kimler</u>, 335 F.3d at 1146.
In determining which test to apply, the courts generally cite to
and rely upon the Supreme Court decisions in <u>United States</u> v.

_Knights_ and _Griffin_ v. _Wisconsin_.  _See, e.g._, _Kincade_, 379 F.3d
at 832 (applying a general balancing test).  In both _Knights_ and
_Griffin_, the Supreme Court addressed the Fourth Amendment as it
applied to persons on probation, though neither case dealt with
the collection of DNA.  _See Griffin_, 483 U.S. at 873; _Knights_,
534 U.S. at 119.  Though no holding from the Supreme Court or the
First Circuit is directly on point, it is proper, in the absence
of such a holding, to look to cases applying the Fourth Amendment
to probationers and parolees to determine the proper test to
apply to the facts at issue.

In _Griffin_, the Supreme Court upheld a warrantless search of
the probationer's home by applying the "special needs" exception.
483 U.S. at 873-74.  The "special need" to effectively operate a
probation system justified the departure from the traditional
warrant and probable-cause requirements.  _Id._  This departure,
however, was not complete in _Griffin_ because "reasonable grounds"
existed to support the search.  _Id._ at 875-76.  As a result, the
search of the probationer's home in _Griffin_ was not a completely
suspicionless search.  _See id._

In _Knights_, the Supreme Court again upheld a warrantless
search of a probationer's home, but did so without conducting a
"special needs" analysis.  _See Knights_, 534 U.S. at 121-22.
Instead, the Supreme Court applied the general Fourth Amendment
totality of the circumstances balancing test for reasonableness.

17

Id.  The search satisfied this analysis, but, importantly, the
Supreme Court found that the search was supported by reasonable
suspicion and authorized by a specific condition of probation.
Id. at 122.

     After Griffin and Knights, two approaches existed for
applying the Fourth Amendment to warrantless searches of
probationers.  Neither case, however, directly addresses which
test to apply to the completely suspicionless search of a
probationer.  In fact, the Supreme Court in Knights specifically
noted that its analysis neither reached nor addressed the issue
of a search conducted without any individualized suspicion.  Id.
at 120 n.6.  The proper test to apply in the context of a search
of a probationer remained in flux.

     The Supreme Court, in Samson v. California, addressed the
question left open in Knights, though it did so in the context of
a parolee, not a probationer.  126 S. Ct. at 2198.  In Samson,
the Supreme Court applied a general balancing test to hold that
the "Fourth Amendment does not prohibit a police officer from
conducting a suspicionless search of a parolee."  Id. at 2202.
Though the person's status as a parolee was "salient" to the
reasonableness test as applied and is critical to the analysis at
hand, it does not affect which test is appropriate.  See id. at
2197 (quoting Knights, 534 U.S. at 118).  As a result, Samson,
especially in light of Knights, settles the issue as to which

Fourth Amendment test is appropriate, though it does so by widening the general balancing test to include suspicionless searches.  See Vernonia Sch. Dist., 515 U.S. at 667 (O'Connor, J., dissenting) ("For most of our constitutional history, mass, suspicionless searches have been generally considered *per se* unreasonable within the meaning of the Fourth Amendment."). Thus, when addressing the issue before this Court, a search of either a parolee or a probationer, the Court must follow a general, totality of the circumstances balancing test for reasonableness.  See Samson 126 S. Ct. at 2197.

> ### E.   General Balancing Test Applied

Applying a general balancing test, as it appears this Court must after Samson, the DNA search of Stewart is unreasonable unless, in light of the totality of circumstances, the legitimate governmental interest identified outweighs the resulting intrusion into Stewart's expectation of privacy both in his bodily integrity and in the information derived from his DNA. See Samson, 126 S. Ct. at 2197; Knights, 534 U.S. at 118-19; Skinner, 489 U.S. at 616-17.  The outcome of the balancing is largely determined by how the two weights in the balance are characterized.

> #### 1.   Governmental Interest

The cases that deal with searches of probationers generally and cases that directly address the issue of DNA collection

appear to raise three possible governmental interests furthered by a regime of warrantless, suspicionless seizures of DNA from probationers.  Those governmental interests include a general supervisory interest in probationers, see Griffin, 483 U.S. at 876, prevention of recidivism through deterrence, see Kincade, 379 F.3d at 838-39, and the development and maintenance of a DNA database to assist in the solving of past and prospective crimes, Nicholas, 430 F.3d at 668 (holding that the primary purpose of a New York statute creating a DNA database was to assist in solving crimes).

In assessing the strength of the governmental interest, it is recognized that the category of warrantless and suspicionless searches must be held "closely guarded" against the encroachment of governmental action.  See Chandler, 520 U.S. at 309.  Such searches ought be upheld only in limited circumstances where the governmental need presents a strong imperative to dispense with traditional safeguards.  See id. at 313-14; see also, e.g., United States v. Ramsey, 431 U.S. 606, 616 (1977) (upholding searches at the nation's border due to the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country").  In addition, since this Court must operate within the framework of a general balancing test and not a "special needs" exception, there is no recognized prohibition against recognizing that the primary

purpose of the search is facilitating a general interest in crime control.  See Edmond, 531 U.S. at 47-48.  The rationale behind the recognition of that prohibition in the "special needs" context is, however, instructive and persuasive for this particular application of the general balancing test.  See id. at 42 ("Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.").

The traditional Fourth Amendment safeguards of individualized suspicion and a warrant exist to curb overreaching by law enforcement officials who, in the zealous performance of their duty, may justify the invasion of a privacy interest to pursue an immediate law enforcement objective.  See Johnson v. United States, 333 U.S. 10, 13-14 (1948) ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.").  Since law enforcement officers are duty bound to pursue present imperatives, it is unwise to entrust to them a diametrically opposed duty -- the duty to protect the long-term interests of an individual in personal privacy.[5]  The traditional safeguards, therefore, interpose a

---

[5] Additionally, in a recent comment on the Samson decision, the question was raised, "[b]ut who will watch the watchers?" *The Supreme Court, 2005 Term -- Leading Cases*, 120 Harv. L. Rev.

level of restraint on those actions and, at times, a neutral arbiter.  See id.  The "special needs" context removes these traditional safeguards but replaces them with modified restraints intended to serve the same or a similar function.  See Ferguson, 532 U.S. at 79.  One such restraint is the prohibition against the primary purpose of the search being generalized crime control.  See Edmond, 531 U.S. at 44.  The underlying rationale of that prohibition is that the further the primary purpose of the governmental action is from general crime control, the more society can comfortably accept law enforcement action to accomplish health or safety goals devoid of traditional safeguards.  See id. at 43-44; National Treasury Employees Union, 489 U.S. at 666.[6]

---

183, 192 (2006).  The comment criticized the Samson decision by stating that "encroachments on parolee privacy rights in California have already created the concern that for ordinary, law-abiding citizens who are aware of the increasing surveillance capabilities of the State privacy expectations are eroding and '[t]he fishbowl will [soon] look like home.'"  Id. (citing Kincade, 379 F.3d at 873 (Kozinski, J., dissenting)). "Ultimately the Court is in the position to establish boundaries and guidelines that will maintain the integrity of privacy rights while giving the states room to adopt anti-recidivism strategies."  Id.

[6] In a case with an analogous rationale, the Supreme Court, in Illinois v. Lidster, upheld a seizure of vehicles at a roadblock because the law enforcement purpose was to seek information about a crime likely committed by someone other than the person questioned.  540 U.S. 419, 423 (2004).  In such a situation, there is less concern that the governmental action will invade the privacy rights of the person seized to pursue such a purpose.

This rationale, though borrowed to a limited extent from the "special needs" exception, is applicable in this situation.  In the context of a search of persons released yet under continuing supervision, the Supreme Court has relaxed the traditional safeguards.  See Samson, 126 S. Ct. 2193.  This follows the move away from a unified reading of the Fourth Amendment and comports with the modern practice of focusing solely on the vague concept of reasonableness balancing.  See Knights, 534 U.S. at 118. Under the reasonableness balancing, however, this Court must examine the totality of the circumstances when calculating the proper weight to apply to each side of the scale.  See id.  This inquiry is conducted in full recognition that the context involves the narrow and circumscribed area of warrantless and suspicionless searches.  See Chandler, 520 U.S. at 309.  As a result, the further the governmental interest strays from a probation-specific purpose and the closer it resembles general crime control, the less weight this Court will attach to this aspect of reasonableness balancing.  This does not mean that it is proper to conflate the requirements of a "special needs" exception with the reasonableness balancing test, but simply seeks to modify and explain what constitutes a "legitimate" interest, by requiring a close nexus with the status of probation.

23

The first governmental interest considered is the general supervisory interest in monitoring probationers.  See Griffin, 483 U.S. at 876.  In Samson, the Supreme Court held that the state had a legitimate supervisory interest in warrantless, suspicionless searches of parolees.  Samson, 126 S. Ct. at 2200-01.  Specifically, this interest was considered legitimate because parolees are more likely to commit crimes in the future, and expeditious supervisory measures are required in order to prevent parolees from having the opportunity to "anticipate searches and conceal criminality."  Id. at 2201.  This rationale finds foundation in the impracticability of obtaining a search warrant, a rationale similar to the underlying motivation used to support the administrative or "special needs" exception.  See Schmerber, 384 U.S. at 770 (holding a search permissible where the officer reasonably believed he faced an emergency situation that would result in the destruction of evidence).

The search at issue in Samson involved a physical search of the parolee's person.  126 S. Ct. at 2196.  The searches in Griffin and Knights also involved physical searches, but of the probationers' homes.  Knights, 534 U.S. at 115; Griffin, 483 U.S. at 870-71.  The rationale that expeditious searches of released persons are necessary to prevent the concealment of criminality is logical in the context of physical supervision.  It is possible that a parolee or a probationer could destroy evidence

24

of criminal wrongdoing in the time it took a probation or law enforcement officer to obtain a warrant.

This rationale, however, cannot be extended to searches to extract one's DNA. There is no exigency that supports its collection because a probationer cannot take any action to thwart or conceal the information contained in his DNA. Contra Schmerber, 384 U.S. at 770-71. In addition, DNA provides no immediate indication of criminal wrongdoing but requires a further test and a cross-reference in a database to reveal actionable evidence. There is no reason why a probation officer who suspects ongoing criminal activity could not take the reasonable time to secure a warrant for DNA collection without fear that the information he seeks would be destroyed or concealed. Contra Samson, 126 S. Ct. at 2201 (applying the conclusion from Griffin that the "incentive-to-conceal concern justified an 'intensive' system for supervising probationers"). In fact, in this case Stewart is objecting to a programmatic collection of his DNA -- one not even remotely based upon exigency or an "incentive-to-conceal" rationale. Thus, no legitimate supervisory interest exists to require the warrantless and suspicionless search of Stewart's DNA.

The second governmental interest normally presented to support DNA collection is based upon the prevention of recidivism through deterrence. See Kincade, 379 F.3d at 838-39. The

government certainly has a legitimate interest in reducing high recidivism rates of persons convicted of crimes.  See Ewing v. California, 538 U.S. 11, 26 (2003) (citing a United States Department of Justice report that found "approximately 67 percent of former inmates released from state prisons were charged with at least one 'serious' new crime within three years of their release.").  In addition, the Supreme Court has recognized that deterrence is a legitimate rationale for methods used to combat recidivism.  See id. at 26-27; Rummel v. Estelle, 445 U.S. 263, 284 (1980).

In this case, however, the underlying theory of this governmental interest is that a probationer is more likely to comply with probationary conditions if he knows to a greater certainty that any subsequent criminal activity will be attributed to him.  See Knights, 534 U.S. at 120 (citing Griffin, 483 U.S. at 880).  This conclusion is speculative at best, and it relies upon multiple inferences to demonstrate the psychological effect that fear of DNA matching will have on criminal activity. This interest cannot be discounted completely because of its speculative nature, but the lack of direct evidence and a direct link between the governmental action and the effect on recidivism weakens it on the reasonableness balance.

One need not look further than the crime with which Stewart was charged to understand the attenuated nature of this interest

and argument.  Stewart pled guilty to a property crime -- the
unlawful diversion and collection of Social Security disability
benefits.  DNA evidence played, and would play in the future,
little to no role in the discovery, solving, or prosecution of
such an electronic crime.  If Stewart were to recidivate, the
knowledge that CODIS contained his DNA would not deter him from
doing so.  Even if this governmental interest were legitimate in
general, it certainly is not legitimate when applied to Stewart
and the facts of this case.

The third governmental interest is closely related to the
deterrence rationale.  This purpose seeks the development and
maintenance of a DNA database to assist in the solving of past
and prospective crimes.  See Nicholas, 430 F.3d at 668.  This
general interest in crime control harmonizes with the underlying
motivation of the development of CODIS and the passage of the DNA
Act in the first place.  See H.R. Rep. No. 106-900(I), at 8.  As
discussed above, when a court performs general reasonableness
balancing, there is no absolute bar against a governmental
purpose primarily directed at a general crime control objective.
A court ought not, however, attribute overmuch weight to such a
general objective when operating in the context of the suspect
class of suspicionless and warrantless searches.  See Chandler,
520 U.S. at 309; cf. Edmond, 531 U.S. at 41-42 (applying this

27

rationale to invalidate suspicionless searches at a drug
interdiction roadblock).

The government undoubtedly challenges the characterization
of this interest as less heavy because this search is conducted
only against those previously convicted of a crime.  Such an
argument, however, unduly skews the effect of a diminished
expectation of privacy from one's status as a probationer on both
sides of the reasonableness balancing test.  See Stephen J.
Schulhofer, On the Fourth Amendment Rights of the Law Abiding
Public, 1989 Sup. Ct. Rev. 87, 135-36 (1989) (describing the
double-counting of a diminished expectation of privacy as
"putting the thumb down on one side of the scale and using the
fingers to push up on the other").  Stewart's probationary
status, as described below, allows for a governmental search to
intrude to a greater degree into his privacy and yet maintain its
reasonableness.  The government cannot, however, also use this
probationary status to increase the importance of the
governmental purpose served by the search.  As a result, the
government presents only less weighty governmental interests for
measurement against the resulting intrusion.

##         2.    Intrusion

The governmental interests described above must now be
balanced against the invasion of Stewart's privacy that results.
When considering this side of the balance, a court must consider

the nature of the privacy interest invaded and the degree to
which that particular intrusion affects the privacy interest of
the person searched.  See Vernonia Sch. Dist., 515 U.S. at 653-
54.

The inquiry into the nature and degree of intrusion begins
with addressing and taking into account Stewart's status as a
probationer.  The Supreme Court has recognized that the
"institutional needs and objectives" of prison facilities
necessarily require, as a practical matter, the curtailment of
certain rights.  Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974);
Bell v. Wolfish, 441 U.S. 520, 559 (1979) ("A detention facility
is a unique place fraught with serious security dangers.").  The
paramount concern in this respect is internal security.  Hudson
v. Palmer, 468 U.S. 517, 524 (1984).  The curtailments of rights
are reminders, however, that "under our system of justice,
deterrence and retribution are factors in addition to
correction."  Id.  To this end, the Supreme Court has held that
the practical needs of a penal institution cannot be reconciled
with a recognition of full privacy rights for prisoners.  Id. at
526.  As a result, a prisoner does not have a reasonable
expectation of privacy in his prison cell, and, therefore, the
Fourth Amendment's prohibition against unreasonable searches and
seizures does not attach.  Id.  Despite this recognition of
diminished Fourth Amendment rights, the Supreme Court, in Hudson

29

v. Palmer, noted that prison inmates do retain significant substantive rights, and that the continuing guarantee of these rights is "testimony to a belief that the way a society treats those who have transgressed against it is evidence of the essential character of that society."  Id. at 523-24.

While the Fourth Amendment analysis for an incarcerated prisoner rests on clear practical imperatives, not all punishments that implicate similar practical and policy-based factors are as clear.  The Supreme Court, in Griffin, recognized that a continuum of possible punishments exist that range "from solitary confinement in a maximum-security facility to a few hours of mandatory community service."  483 U.S. at 874. Included in the range of punishments on this continuum are parole and probation.  Id.; Morrissey v. Brewer, 408 U.S. 471, 477 (1972).  Parole is defined as "[t]he release of a prisoner from imprisonment before the full sentence has been served."  Black's Law Dictionary 1139 (7th ed. 1999).  Probation is defined as "[a] court-imposed criminal sentence that, subject to state conditions, releases a convicted person into the community instead of sending the criminal to jail or prison."  Id. at 1220. This distinction is not merely academic.  The Supreme Court, in Samson, recognized the distinction between a parolee and a probationer.  126 S. Ct. at 2198.  In Samson, the Supreme Court stated that "[o]n this continuum [of punishments], parolees have

fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." <u>Id.</u>

Of course, pursuant to the Sentencing Reform Act of 1984, federal courts have replaced parole with "supervised release," which presents some doubt as to where it falls on the continuum. In <u>Samson</u>, the Supreme Court, while distinguishing parole from probation, cited the Second Circuit case, <u>United States</u> v. <u>Reyes</u>, 283 F.3d 446, 461 (2d Cir. 2002), which held "federal supervised release, . . . in contrast to probation, is meted out in addition to, not in lieu of, incarceration." <u>Samson</u>, 126 S. Ct. at 2198; <u>see</u> <u>also</u> <u>United States</u> v. <u>Lifshitz</u>, 369 F.3d 173, 181 n.4 (2d Cir. 2004) ("Supervised release, parole, and probation lie on a continuum.  The most severe is 'supervised release.'") As a result, it seems logical to consider supervised release analytically as restrictive as parole, which would place it as a status deserving of a lesser expectation of privacy than probation.

There is no doubt that persons on parole, probation, or federal supervised release "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special restrictions.'" <u>Griffin</u>, 483 U.S. at 874 (quoting <u>Morrissey</u>, 408

U.S. at 480).  The Supreme Court has been clear, however, that such restrictions are not unlimited.  Id. at 875.

The Supreme Court has included diminished Fourth Amendment protections in the curtailment of rights faced by a parolee and a probationer.  See id. at 880; Knights, 534 U.S. at 121-22.  The Supreme Court, in Griffin and in Knights, upheld the warrantless search of a probationer's residence.  Griffin, 483 U.S. at 880; Knights, 534 U.S. at 121-22.  In upholding those suspect searches, the Supreme Court identified the status of the probationer as "salient" to its holding.  Knights, 534 U.S. at 118.  Because the Supreme Court placed so much emphasis on status in reaching its holding, any inquiry into the intrusion on Stewart's privacy interests must begin with an understanding of where he falls on the continuum of punishment and, resulting from that, the degree of privacy he can constitutionally expect.  See Griffin, 483 U.S. at 874.

Stewart pled guilty to one Count of Theft of Public Money, Property or Records (namely social security disability funds) under 18 U.S.C. § 641.  Stewart never served any jail time.  He was sentenced to three years on probation.  There is no doubt that Stewart, as a probationer, does not enjoy the full liberty interests that he would otherwise expect and demand had he not committed a crime.  See Griffin, 483 U.S. at 874.  On the punishment continuum, Stewart has fewer expectations of privacy

32

than a person who had not committed a crime but more than someone on parole or supervised release.  See Samson, 126 S. Ct. at 2198.

Stewart's status as a probationer distinguishes this case from all but one cited by the government.  In Groceman v. United Stated Dep't of Justice, 354 F.3d 411 (5th Cir. 2004) (per curiam), Green v. Berge, 354 F.3d at 676-77, Padgett v. Georgia Dep't of Corr., 401 F.3d 1273 (11th Cir. 2005), Jones v. Dir. of Dep't of Corr., 962 F.2d 302, 306 (4th Cir. 1992), and Nicholas v. Goord, 430 F.3d 652, the person refusing to submit to collection of DNA was incarcerated.  On the punishment continuum as described above, incarceration places the prisoner at the lowest degree of any expectation of privacy.  See Griffin, 483 U.S. at 874.  This diminished expectation of privacy arises from having no Fourth Amendment rights in their prison cells, Hudson, 468 U.S. at 526, and from the continual need "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution," Bell, 441 U.S. at 558.  The holdings in Hudson and Bell do not, however, provide clear guidance as to the scope of a prisoner's Fourth Amendment rights in his bodily integrity, though the emphasis placed on the need to provide a safe prison environment free of contraband appears to support a conclusion that such rights, if they remain, would be severely diminished. See Hudson, 468 U.S. at 526-27; Bell, 441 U.S. at 558.

The circuit courts that have upheld such DNA searches for incarcerated prisoners appear to have drawn that inference and conclusion from Hudson, or at least from Hudson's logic.   For example, the Eleventh Circuit, in Padgett, cites to Hudson before concluding that "[b]ecause of these and other limitations on prisoners' Fourth Amendment rights, courts have recognized that prisoners comprise a separate category of persons for purposes of the Amendment."   Padgett, 401 F.3d at 1278-79.   The court in Padgett went even further and distinguished two Supreme Court cases, Edmond and Ferguson, that struck down suspicionless searches because "the searches they discussed were performed on free persons, not *incarcerated* felons."   Id. at 1279 (emphasis added).   In Nicholas, the Second Circuit weighed the balance in favor of the governmental interest in securing the DNA information as against the intrusion on the bodily integrity of the prisoner.   430 F.3d at 670.   In considering the privacy rights of the prisoner, however, the court stated that "[i]n the prison context, where inmates are routinely subject to medical procedures, including blood draws, and where their expectation of bodily privacy, while intact, is diminished, the intrusiveness of a blood draw is even further minimized."   Id. at 669 (internal citations omitted).   The status as an incarcerated prisoner, therefore, presented a major factor in the analysis.   See id.

34

The distinction between the expectation of privacy of an incarcerated person and one released from incarceration (e.g., supervised release, parole, or probation) is compelling considering the practical and pragmatic concerns of running a prison day to day.  See Hudson, 468 U.S. at 527 ("The administration of a prison, we have said, is 'at best an extraordinarily difficult undertaking.'") (quoting Wolff, 418 U.S. at 566).  The distinction may be extended to differentiate between the subcategories of release, especially after Samson. But see Green, 354 F.3d at 680 (Easterbrook, J., concurring) (grouping persons on parole, probation, and supervised release in the same analytical category); Johnson, 440 F.3d at 496-97.

Accepting that a distinction must be drawn among types of "released" persons, it should be noted that the government only cites to one case, Johnson, that addresses a search of a probationer.  440 F.3d at 497.  Sczubelek, 402 F.3d at 184, Kincade, 379 F.3d at 820, and Kimler, 335 F.3d at 1146, all address searches of persons on supervised release.  Supervised release falls further away on the continuum from full Fourth Amendment protections.  See Samson, 126 S. Ct at 2198; Lifshitz, 369 F.3d at 181 n.4.  As a result, since the case before this Court deals with a probationer and only one circuit truly has spoken on this issue, see Johnson, 440 F.3d at 497, the

government's argument that a weight of authority exists upholding similar searches is unavailing.

The lesser expectation of privacy enjoyed by Stewart as a probationer, though not as diminished as a person incarcerated or on supervised release, allows for a greater degree of intrusion before reaching the threshold of an unreasonable search.  See Samson, 126 S. Ct. at 2198.  As described above, the extraction of blood to collect and analyze one's DNA presents two separate constitutionally protected searches -- the physical penetration and the subsequent chemical analysis.  See Skinner, 489 U.S. at 616.

The physical intrusion of performing the blood test itself implicates a privacy interest in one's bodily integrity.  See Schmerber, 384 U.S. at 769-70.  The Supreme Court, in Schmerber, held that one's privacy interests in bodily integrity are implicated by intrusions past the bodily surface.  See id.  The Supreme Court concluded that the warrantless blood extraction was reasonable because blood tests have become so commonplace that their intrusion are likely to be considered minimal.  Id. at 770-71.  It did so, however, in the context of a search supported by probable cause and where the officer faced an emergency situation where the evidence of alcohol in the blood would be lost absent such a search.  Id.  The Supreme Court explicitly limited this holding to the specific facts at issue, which included the

36

safeguards of individualized suspicion and a strong governmental imperative. See id. at 772. It also drew a sharp line between physical searches for weapons and searches that intruded past the body's surface. See id. at 769-70. Searches that do proceed past the body's surface, which include a simple blood test, implicate "fundamental human interests." See id. at 770 ("The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained.").

The D.C. Circuit, in Johnson, misapplies the holding of Schmerber to the warrantless and suspicionless collection of DNA of a probationer. See Johnson, 440 F.3d at 496. The court cites to Schmerber for the proposition that blood tests have become so common that the physical penetration necessary to collect DNA presents only a minimal intrusion. Id. The court failed to credit, however, that the "minimal intrusion" in Schmerber fell within the context of a "special needs" case with the attendant safeguard of probable cause. Schmerber, 384 U.S. at 770-71; see Skinner, 489 U.S. at 625 (reaching a similar holding as in Schmerber while also analyzing the intrusion under a "special needs" exception). An intrusion found minimal when supported by probable cause, as in Schmerber, becomes markedly more intrusive in a suspicionless search regime.

This intrusion and invasion of one's bodily integrity must, of course, be qualified by the status of Stewart as a probationer.  It is logical that a prisoner or one who has been incarcerated would experience a lesser expectation of privacy in one's bodily integrity.  See Bell, 441 U.S. at 558.  This lesser degree of privacy would result from the needs of prison officials to check intimate areas of a prisoner's body for weapons or drugs.  See id.  The theory underlying this principle is that once a person has been subject to such searches, one does not expect to retain such privacy.

This logic breaks down when applied and extended to probationers who have not served time in this environment and have not experienced this repeated searching.  See id.  In addition, the logic is not applicable to a person released and no longer subject to such searches.  The intrusion past one's bodily surface implicates the most grave privacy rights.  See Schmerber, 384 U.S. at 769-70; Nicholas, 430 F.3d at 658 (recognizing the difference between "the physical intrusion required to take a fingerprint and the intrusion required to draw a blood sample is [] constitutionally significant").  In the context of a warrantless and suspicionless search, where the governmental interest is narrowly tailored and compelling only with regard to the physical surveillance of a probationer, even the minimal

intrusion past the bodily surface caused by a blood test presents a search devoid of reasonableness.

The D.C. Circuit in Johnson relies upon the lessened privacy interests of a probationer to uphold a search for DNA, but fails to recognize this distinction between a search of a body's surface and even a minimal penetration of the skin.  See 440 F.3d at 497.  The court compares the collection of blood for DNA to the collection of fingerprints and concludes by analogy that if a probationer cannot refuse the collection of the latter then he cannot refuse the former.  See id.  Holding that the intrusion that results from the penetration of skin comparable to taking an ink imprint of the tips of one's fingers fails to recognize the constitutionally significant difference between the two searches. See Schmerber, 384 U.S. at 769-70; Nicholas, 430 F.3d at 658.  A probationer does have a lessened expectation of privacy in physical searches of his home and person, and this rationale may properly be extended to support the collection of fingerprints, but it cannot be extended yet another degree and used to support the graver intrusion that results from the penetration of a person's body.

In addition, the chemical analysis of Stewart's DNA presents an even greater intrusion.  As Judge Keeton held in United States v. Weikert, "the later analysis and identifying information that is then stored in CODIS are likely much more of an invasion of an

individual's privacy than the initial blood test."  421 F. Supp.
2d 259, 266 (D. Mass. 2006) (appeal pending).  This second
intrusion is generally downplayed by courts that have upheld this
search regime.  See, e.g., Kincade, 379 F.3d at 836-38; Johnson,
440 F.3d at 496-97.  It is this second intrusion that contains
information about one's genetic make-up and physiological data
discussed above.  Kincade, at 849-50 (Reinhardt, J., dissenting).
This intrusion has a physical predicate that is brief, yet it is
expansive in scope and breadth regarding the private information
revealed.  The degree of information available from DNA
distinguishes this intrusion from the limited nature of a
fingerprint search that cannot reveal anything other than
identifying marks.  See Davis v. Mississippi, 394 U.S. 721, 727
(1969) ("Fingerprinting involves none of the probing into an
individual's private life and thoughts that marks an
interrogation or search.").

The determinative question again becomes whether a
probationer's lessened expectation of privacy makes a search and
seizure of such information permissible.  A probationer does
suffer a diminished expectation of privacy in information and
activities related to his supervision and possibly in some
information that would assist in deterring him from committing
future crimes.  See Samson, 126 S. Ct. at 2198-2200.  But just as
Supreme Court precedent supports this principle, it equally

supports the countervailing principle that a person on probation retains some constitutional rights, and that restrictions on those rights are not unlimited.  See Griffin, 483 U.S. at 874. The Supreme Court's pronouncements that such persons retain some rights protected by the Fourth Amendment require the line for impermissible warrantless, suspicionless searches to be drawn somewhere (i.e., a probationer must retain *some* protections against searches and seizures).  Due to the extensive invasion of privacy interests presented by DNA analysis, finding such a search reasonable would eliminate all Fourth Amendment protections for such individuals and effectively nullify the Supreme Court's holdings to the contrary.  See Griffin, 483 U.S. at 874.

In addition, the Supreme Court has said that a person on probation retains more privacy rights than a prisoner and more rights than one on supervised release or parole.  See Samson, 126 S. Ct. at 2198.  The Supreme Court applies a balancing test and has not adopted a categorical approach that renders all searches of probationers reasonable.  See id.  Following this logic, there must be *some* privacy rights that a probationer retains and from which he can exclude the government unless it comes armed with a warrant or individualized suspicion.  See id.  Once again, if the information contained in one's DNA does not fall within this

41

category, it is difficult, if not impossible, to imagine what would satisfy such a test.

The need to protect such inherently private information is even more compelling when considering that Fourth Amendment protections once lost, are likely lost forever.  Under the current analytical framework for the Fourth Amendment, such protections attach only as long as society objectively recognizes a personal, subjective expectation of privacy as reasonable.  See Katz, 389 U.S. at 361 (Harlan, J., concurring).  As a result, an individual will lose Fourth Amendment protections as information becomes so pervasively available and public that objectively one could not expect to exclude others from performing such actions or accessing such data.  See id.  The protection of privacy for the whole society is dependent upon the vigorous defense of the privacy interests of the individual.  To allow the reverse to occur and to support an encroachment on the privacy interests of a segment of society is to create a class of persons who must be resigned to such intrusions, diluting society's cohesive and objective recognition of one's right to exclude others from obtaining that information.  See id.  Society cannot reclaim an objective expectation of privacy once it is surrendered.[7]

---

[7] The Second Circuit, in Nicholas v. Gourd, registers and credits the potential for widespread abuse of the information derived from DNA, but overlooks this point about the inability to reclaim expectations of privacy.  See 430 F.3d at 670-71.  In light of the currently applied reasonableness balancing test, the

Here, the segment of society that the government seeks to search is in no way marginal.  The most recent data from the United States Department of Justice indicates that one out of every forty-two Americans -- over seven million persons -- are either in prison, on parole, or on probation.  U.S. Dep't of Justice, Bureau of Justice Statistics, Prison Statistics, http://www.ojp.usdoj.gov/bjs/prisons.htm (reporting that as of December 31, 2005, 2,193,798 prisoners were held in federal or state prisons or in local jails); U.S. Dep't of Justice, Bureau of Justice Statistics, Probation and Parole Statistics, http://www.ojp.usdoj.gov/bjs/pandp.htm (reporting that at the end of 2005, over 4,900,000 adult men and women were under federal, state, or local probation or parole jurisdiction with approximately 4,162,500 on probation and 784,400 on parole).  In light of such statistics, the scope and effect of such a search regime is staggering.

The fear of such a slippery slope would be mitigated to some extent if this Court could apply, and the government action could satisfy, a "special needs" exception.  See Vernonia, 515 U.S. at 663-64.  Under such an analysis, comfort could be found if attendant safeguards, such as a special need other than general crime control, and a method narrowly tailored to

---

comfort derived by the Second Circuit in the perceived ability of the courts to apply a "different calculus" if such dangers materialize is simply misplaced.  See id.

43

effectuate that means existed in lieu of the traditional Fourth
Amendment protections of probable cause and a warrant.  <u>See</u>
<u>Skinner</u>, 489 U.S. at 629-30.  Unfortunately, this Court must
analyze this search regime under a general, reasonableness
balancing test that requires a finding of minimal intrusion on a
probationer's privacy to validate the search as reasonable.  <u>See</u>
<u>Samson</u>, 126 S. Ct. at 2197.  Where that search includes the
forced collection and analysis of this probationer's DNA -- that
conclusion simply cannot be reached.

In finding an unreasonable intrusion, this Court did not and
does not weigh the possible limitations on such an intrusion that
a search conducted pursuant to the programmatic guidelines of the
DNA Act may have presented.  The Supreme Court has recognized
that the existence of defined and discretion-limiting regulations
may satisfy the traditional safeguards of probable cause and a
warrant when operating under the administrative search exception
to the general Fourth Amendment inquiry.  <u>See</u> <u>Camara</u>, 387 U.S. at
536-38; <u>Biswell</u>, 406 U.S. at 317.  Such cases, however, also
require the additional safeguard of a governmental purpose
divorced from general crime control.  <u>See</u> <u>Edmond</u>, 531 U.S. 47-48.
In light of the Supreme Court's pronouncement in <u>Samson</u> that a
general balancing test and not an administrative search exception
applies and because the DNA Act primarily serves to solve past
and prospective crimes, it would be improper to conflate the two

separate Fourth Amendment analyses and begin a patchwork
borrowing of divergent aspects to uphold a governmental search.

Crediting such supposed limitations as lessening the
resulting intrusion on privacy not only fails to conform to the
applicable Fourth Amendment test; it is also unwise given the
long history of the eventual expansion of databases' initial,
discrete purposes.  Few social and political truisms echo more
faithfully then Lord Acton's observation in a letter to Bishop
Mandell Creighton in 1887 that "absolute power corrupts
absolutely."  J. Bartlett, Familiar Quotations 750 (14th ed.
1968).  The analog in the database context drawn from this maxim
is that all information collected will one day be exploited.
This country's history with national databases supports this
conclusion.

For example, in the 1930s, the assignment of Social Security
numbers was intended for the limited purpose of aiding new
retirement programs.[8]  Simoncelli & Steinhardt, supra, at 283.
Their use soon expanded past that limited purpose and now
provides a near universal identification number.  Id.

---

[8] The Department of Homeland Security recently used a
government data system called the Basic Pilot program to mine and
match names with Social Security numbers in support of an
immigration enforcement action called Operation Wagon Train.
This federal enforcement action resulted in the arrest of 1,282
persons.  Mike McPhee, Largest Workplace Raid Ever,
DenverPost.com, Dec. 13, 2006, at
http://www.denverpost.com/ci_4832387.

Additionally, the government mined census records collected for
general statistical purposes to aid in the Japanese internment
program during World War II.  Id.  Finally, two National Security
Agency intelligence collection programs, Operation MINARET and
Operation SHAMROCK, operated during the Cold War, began with the
narrow purpose of exploiting foreign intelligence for national
security purposes.  The National Security Agency and Fourth
Amendment Rights: Hearing on S. Res. 21 Before the Select Comm.
to Study Governmental Operations with Respect to Intelligence
Activities, 94th Cong. 10-13, 30, 57-58 (1975).  Soon, both
programs expanded past this initial purpose and turned the
awesome power of its collection capabilities and data-mining
against American citizens and domestic terminals.  See id. at 10-
12, 62.  This last example of "mission creep" commonly found in
national information collection and the creation of national
databases is particularly illuminating because it demonstrates
how undue expansion of past narrowly prescribed purposes can
occur as a result of good intentions.  Notable to Operation
MINARET was that the National Security Agency, in a commendable
effort to target a *more narrow* class of persons, eventually
sought, obtained, and exploited a *greater amount* of raw privacy
information in the process.  See id. at 13.  This made the
surveillance of each target less intrusive, but only through the
more expansive intrusion exerted on the populace at large.  See

46

id. See generally Dara Jebrock, Securing Liberty: Terrorizing
Fourth Amendment Protections in a Post 9/11 World, 30 Nova L.
Rev. 279 (2006).

The lesson that history requires from these experiences is
that privacy protection must always begin at the front door.[9]
The expansion past limited and discrete initial purposes does not
require, but is certainly propelled by, ill motive.  As a result,
while speculative harms may not compel the finding of a *greater*
intrusion based upon those fears, the existence of a present,
discrete purpose detailed by statutory guidelines will not
support the reverse finding that a *lesser* intrusion occurs.

This fear becomes even more credible when considering that a
"re-search" of the DNA database once constructed may not
implicate the Fourth Amendment.  See Johnson, 440 F.3d at 498.
In Johnson, the D.C. Circuit cited the Supreme Court case of
Arizona v. Hicks, 480 U.S. 321 (1987), to support the proposition
that accessing stored records in CODIS is not a "search" under

---

[9] In a recent comment on the Second Circuit's decision in
MacWade v. Kelly, 460 F.3d 260 (2d Cir. 2006), upholding New York
City's subway search program, concerns were raised over its
consequences for the scope of collection of DNA due to the
weakening of the "special needs" doctrine.  See Recent Cases,
*Criminal Law – Fourth Amendment – Second Circuit Holds New York
City Subway Searches Constitutional Under Special Needs Doctrine*,
120 Harv. L. Rev. 635, 641-42 (2006).  The comment postulated
that "while every state presently requires certain convicted
felons to provide genetic materials to a DNA databank, relaxing
the requirement of diminished expectations may permit states to
require more citizens to provide genetic material to state
databanks." Id. at 641.

the Fourth Amendment. Id. As a result, the Fourth Amendment may not provide the protection on which many supporters of limited DNA collection rely to prevent tomorrow's more expansive and exploitive use of such information.

Finally, the intrusion that results from such a governmental search cannot be disregarded under a theory that Stewart consented to a waiver of his Fourth Amendment rights. Under this consent theory, a probationer, by agreeing to the terms of his probationary release, waives the right to object to the constitutionality of the terms. See United States v. Barnett, 415 F.3d 690, 691-92 (7th Cir. 2005) ("Constitutional rights like other rights can be waived."). Though it is true that constitutional rights, in some circumstances, may be waived, the government cannot procure such a waiver through unconstitutional conditions. See United States v. Scott, 450 F.3d 863, 866 (9th Cir. 2006). An unconstitutional condition will be found where the government uses overwhelming leverage to coerce a person into accepting the controversial condition. See Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1428 (1989). As the Ninth Circuit explained in United States v. Scott, "[g]iving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections." 450 F.3d at 866.

48

Here, Stewart initially pled not guilty to the underlying Count of Theft of Public Money, Property or Records.  He changed his plea to guilty after receiving a plea agreement whereby the government, in exchange, would recommend a period of probation. Plea Agreement at 4.  The plea agreement did not contain any mention of DNA collection or testing.  See id. at 1-7.  Stewart, after pleading guilty, was sentenced to three years on probation and had the required condition of mandatory DNA collection imposed upon him as a special condition of release.  Order at 2. Stewart, in such a situation, faced incarceration or acceptance of this probationary term.  Under such circumstances, it is unreasonable to conclude that Stewart faced a fair or uncoerced bargain.  Instead, this condition was included not because it was essential to the government's willingness to release him on probation, but simply because the government could exact such a condition without any resulting cost.  When the condition involves a closely protected constitutional right like the Fourth Amendment, uncoerced consent cannot be constructed from such a context.

As a result, the governmental interest in collecting this information fails to override the highly intrusive searches that result first with a penetration into this probationer's body and second with the analysis of his DNA.

49

## III. CONCLUSION

Today this Court faces the latest iteration in the growing tension between technology's ability to advance governmental purposes and the Fourth Amendment's protection of individual privacy.  This tension is faced and resolved by balancing the government's purpose against the resulting intrusion on the individual.  When conducting such a balancing test, the immediate and tangible imperatives of the governmental purpose often outshine and eclipse the more telescopic and inchoate value of personal privacy.  The willingness to watch the erosion of such rights silently is most likely where the vanishing liberties are perceived as not our own.  It is even more acute where the subjects are those who have derided and evaded, through criminal misconduct, the order and legal structure on which they now rely.

But the tapestry of constitutional protections that cover all Americans is woven with long threads, each section and each pattern revealing of the integrity of the whole.  This holding seeks not to mend this fabric, but to preserve it.  To preserve it, most directly, for the unsympathetic probationer who, despite a transgression against the law and against society, is now released to and embraced by that same law and that same society to the full extent reasonably possible.  It is also preserved indirectly and with greater resonance for those who remain untouched by this individual invasion, but who suffer the

collective erosion of their protection against arbitrary state action.

For this purpose, the Fourth Amendment must not be applied with myopic deference to an immediate governmental imperative. Instead, it must be applied cautiously and with broad vision both as to its historical purpose and to its future viability.  As Justice Jackson said after his return from the Nuremberg trials, "one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police." Brinegar v. United States, 338 U.S. 160, 180-81 (1949) (Jackson, J., dissenting).  To this end, "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments." Byars v. United States, 273 U.S. 28, 32 (1927).  These rights are not absolute, and the government, at times, may present public purposes significant enough to overcome such constitutional protections.

The government did not do so in this case.

Accordingly, Stewart's Motion to Modify Conditions of Probation [Docket No. 16] is ALLOWED, and the DNA Analysis

Backlog Elimination Act of 2000 is held unconstitutional as applied to James Stewart.

      SO ORDERED.

                              /s/ William G. Young

                              WILLIAM G. YOUNG
                              DISTRICT JUDGE